Affirmed and Memorandum Opinion filed July 29, 2008








Affirmed and Memorandum Opinion filed July 29, 2008.

 

 

In The

 

Fourteenth Court of
Appeals

_______________

 

NO. 14-06-01055-CV

_______________

 

PRAISE TABERNACLE OUTREACH & FAMILY WORSHIP CENTER


and REFLECTIONS OF CHRIST=S KINGDOM, Appellants

 

V.

 

THE RESTORATION FINANCIAL GROUP, INC. 

and FELECIA W. WARD, Appellees

                                                                                         
                                                      

On Appeal from the County Court at Law
No. 2 & Probate Court

Brazoria County, Texas

Trial Court Cause No. Cl033103

                                                                                                                                               


 

M E M O R A N D U M   O P I N I O N








In this
contract dispute, appellants contend the evidence is legally and factually
insufficient to support the jury=s finding that appellees substantially
complied with the terms and conditions of a contract to procure financing for a
church.  Appellants further assert that the trial court abused its discretion
in denying their motion to disqualify appellees= attorney.  Because we conclude
sufficient evidence supports the challenged jury finding and the trial court
did not abuse its discretion in denying appellants= motion to disqualify, we affirm the
trial court=s judgment.

I.  Factual and Procedural Background

A.        The Breach of Contract
Claim

Felecia
W. Ward advises individuals and organizations in obtaining refinancing of
existing property.  Through her company, the Restoration Financial Group, Inc.
(ARestoration@), she also assists churches in
obtaining loans.  In the summer of 2003, Ward met Dr. Dana Carson, pastor and
chief executive officer of Praise Tabernacle Outreach & Family Worship
Center (APraise Tabernacle@) in Austin and Reflections of Christ=s Kingdom (AROCK@) in Alvin.  After gathering some
initial information from Carson regarding Praise Tabernacle=s financial situation, Ward
determined that she would need assistance in  obtaining refinancing for Praise
Tabernacle.  She consulted with a colleague, David Mitchell, who suggested that
Church Consulting Services (ACCS@) could help in the refinancing effort.

On
September 27, 2003, Praise Tabernacle entered into a loan consulting agreement
with CCS.  CCS agreed to assist Praise Tabernacle to obtain a loan of between
$2.5 million and $3.1 million within sixty days, and in return, CCS would be
paid an amount equal to 1.75 percent of the loan principal.  Ward assisted in
collecting and reviewing loan documents, and, although she did not work for or
have a contract with CCS, Mitchell, an independent consultant with CCS, agreed
to pay her a Areferral fee@ equal to 0.05 percent of the loan principal.

On
November 26, 2003, Praise Tabernacle contracted directly with Ward to obtain
assistance from Ward and Restoration in obtaining a loan for $3.1 million. 
Ward drafted the contract and described the parties= duties as follows:








1.         I will identify a lender who will make a loan in the amount
of $3,100,000.00 that will enable the church to refinance the existing
mortgage and consolidate other existing loans into one payment and reduce the
interest rate.  There could be additional fees associated with doing this
loan[,] i.e. appraisal, CPA costs, underwriting fees, closing costs[,] etc.

2.         Services - I will be responsible for the collecting
and assist with the compiling of all required documents into a loan package
necessary for this loan transaction to be underwritten, approved and funded. 
Additionally, I will be responsible for getting the loan package to the
lender.  I will track the loan process in its entirety.  I will ensure that the
church gets the very best rates and terms available.

Further, I
will work closely with the team you have organized to expedite the loan
process.  Remember that this is a team effort and in order for the loan process
to work[,] we must move swiftly and promptly.  If at anytime [Restoration] is
not getting the requested documents in a timely manner the said contractor
reserves the right to cease all work in connection with your loan until the
required information is received.

If the
Church desires any other assistance (i.e. accountant, design/builder, appraiser
and attorney) that can be discussed at the signing of this contract.  I will
communicate with you on a weekly basis and be available to you whenever you
need me to answer any questions during this process.

3.         Fees - For the above services, you agree to
pay me 2.0% of the loan amount.  $62,000.00 is due to [Restoration] for
services rendered in connection with [Praise Tabernacle] receiving this loan. 
This fee is due and payable upon the closing of your loan.  If the fee is not
paid on time[,] you will be assessed an additional fee of $100/per day for each
day that the fee is late.








In
performing the contract, Ward contacted CCS  for assistance in seeking
refinancing for Praise Tabernacle, but their efforts initially were
unsuccessful.  Ward testified that she could not identify a willing lender
because Praise Tabernacle was in foreclosure and had insufficient income and
assets to demonstrate an ability to make payments.  She further stated that
Comerica Bank, the prospective lender, told her the loan would not be completed
unless ROCK=s property was included in the collateral.  According to Ward, she
reported this conversation to Carson, and he responded that he did not want to
refinance ROCK=s property at that time.  Ward explained she informed Carson that the
loan would not be possible without adding ROCK=s property, and about a week after
the conversation, Carson agreed to add ROCK and its property to the loan
collateral.  Ward testified that she contacted Comerica and reported Carson=s decision, and the bank increased
the amount of the loan under consideration to over $4 million.

On April
23, 2004, the bank approved the loan to Praise Tabernacle and ROCK for $4
million.  On the same day, Ward sent Carson a new contract to replace her
earlier contract with Praise Tabernacle.  The replacement contract added ROCK
to the agreement with Ward and Restoration, increased the identified loan
amount to $4 million, and in accordance with the higher loan amount, provided
that Ward=s fee would be $80,000.  In addition, Ward agreed to defer payment until
after the loan closing.  Ward told Carson that if he did not sign the amended
contract with her, then the loan would not go through.      

Carson
executed the contract on behalf of both churches on May 3, 2004,[1]
and the loan closed in June 2004.  Praise Tabernacle and ROCK paid CCS, but
refused Ward=s demands for payment.  Ward and Restoration then sued Praise Tabernacle
and ROCK for breach of contract.  








Shortly
before trial, Praise Tabernacle and ROCK sought to disqualify Ward=s attorney, former Praise Tabernacle
member Jimmie L. J. Brown, Jr., on the grounds that his representation violated
or threatened to violate Texas Disciplinary Rules of Professional Conduct 1.09
and 1.05.[2]  The trial
court conducted a brief oral hearing on the disqualification motion on
September 18, 2006.  After the trial court denied Praise Tabernacle and ROCK=s motion to disqualify, jury
selection commenced that day. The jury was selected and sworn, and trial began
on September 18, continuing until the jury reached a verdict on September 20,
2006. 

After
hearing all the evidence, the trial court charged the jury on the
breach-of-contract issue, as well as Praise Tabernacle and ROCK=s affirmative defenses of fraud and
accord and satisfaction.  The jury found in favor of Ward and Restoration on
all issues, and against Praise Tabernacle and ROCK on their affirmative
defenses.  The trial court then rendered judgment based on the jury=s findings.  Praise Tabernacle and
ROCK challenge the judgment only based on the jury=s affirmative finding to the
following question:

Do you find
from a preponderance of the evidence that Plaintiff (The Restoration Financial
Group, Inc. and Fel[e]cia Ward) substantially complied with the terms and
conditions of the April 23, 2004 contract?

ASubstantial
Compliance@ means the performance of all important particulars
and any omissions or deviations from the agreement must be inadvertent and
unknowing and not due to bad faith.

Following is a summary of
the testimony and evidence relating to this finding.

1.         Felecia Ward

Ward
testified that she met Carson in September 2003 and was helping him with a
residential loan.  She told Carson she could also help him get a loan for his
church.  She sent a financial-analysis form to Carson to complete regarding
Praise Tabernacle=s finances.  After reviewing the completed form, she
determined that the church would be able to participate in a loan program. 
According to Ward, she gave Carson her contact information, and from that point
until the loan process was complete, she and Carson spoke approximately eight
to ten times a week.  








Ward
explained that, after reviewing the church=s financial analysis information, she
sent Carson a loan-checklist form, requesting specific documents necessary to
further the loan-application process.  According to Ward, Carson gave that
checklist to church staff; staff members assembled the information and returned
it to Ward.  She reviewed the information, contacting Praise Tabernacle=s staff for any missing or additional
information.  Based on her review of the loan information provided by the
church, she determined that Praise Tabernacle lacked sufficient assets or
income to support the $3.1 million loan it sought.  She then informed Carson
that she needed to bring in Asomeone else to assist@ her with the loan-application
process.  Ward stated, AI believed I needed to bring in Church Consulting Services
because I had worked with them in the past and they had experience working with
churches who were in the financial condition of Praise Tabernacle. . . .@  

Ward
testified that she accessed CCS=s website and downloaded several forms.  She gave the forms
to Carson to complete, along with a loan application.  Carson returned the
completed forms to Ward; she reviewed them for completeness and then submitted
them to David Mitchell, a consultant for CCS.  According to Ward, she had known
Mitchell for several years and had worked on other Adeals@ with him in the past.  Ward stated
that she set up a meeting between CCS, Carson, and other church personnel and
attended the meeting by telephone.  Ward explained that the purpose of the
meeting was to coordinate responsibility for various tasks during the loan
identification and application process.  Ward testified, AWe coordinated our efforts.
[Restoration] would interact directly with the church, Praise Tabernacle. . . .
[Restoration] would then interact with [CCS] and Morgan Keegan and Comerica
Bank.@  Ward=s loan file was entered into
evidence; among other things, it contained communications between Ward,
Mitchell, Praise Tabernacle=s accountant Julia Floyd, CCS=s executive director Marv Hoeflinger,
and Comerica Bank and Morgan Keegan personnel.  








Ward
indicated that her normal process was to require a deposit before working with
an organization, but Carson told her Praise Tabernacle could not afford to pay
it.  According to Ward, Carson asked that she begin work and assured her she
would be paid because he would sign a contract.  She worked from September 2003
until the first contract was signed in November 2003, during which time neither
Restoration nor CCS were successful in obtaining a loan for the church.  Ward
testified that the main problem in obtaining financing was that Praise
Tabernacle was in the midst of foreclosure proceedings with its current
mortgage holder, Colonial Trust Co., and that the church lacked assets or
income to sustain a $3.1 million loan.  Ward explained that Comerica Bank did
not want to make the loan to Praise Tabernacle because of the foreclosure
lawsuit; Comerica Bank told Ward that ROCK=s property in Alvin needed to be
added to the loan collateral to justify the loan amount. 

Ward testified
she contacted Carson and informed him that the bank wanted the Alvin property
added as collateral; Carson initially refused, but when Ward explained the bank
would not make the loan without the addition of the Alvin property, Carson
agreed.  With the additional collateral of ROCK=s Alvin property, the loan amount
increased to $4.1 million.  Ward stated, AI pleaded with the bank . . . to do
the loan with the foreclosure in place.  Originally, they were demanding that
the foreclosure be lifted in order for them to give us an approval; so I asked
the bank if they would do the loan knowing that they would be paying off this
other debt.@  Comerica Bank approved the loan on April 23, 2004, the same date as
Ward=s second contract with Praise
Tabernacle and ROCK.  Initially, Ward stated she did not know the loan was
approved before requesting that Carson sign the contract and she did not tell
Carson that if he would not sign the contract, the loan would not go through. 
Later, however, she admitted she was aware that the loan had been approved
prior to sending Carson the second contract and that she had informed Carson
the loan would not go through unless he signed the contract.








Ward
explained that, after the loan was approved, she was responsible for updating
information prior to closing.  She testified that, as part of the loan
agreement, Praise Tabernacle agreed to move its bank accounts to Comerica
Bank.  She called the bank a few days before closing to make sure the accounts
had been moved.  She stated that she spoke with Carson about her payment, and
Carson told her he would pay her after closing because the church would not
have the funds to pay her until then.  She testified that she also spoke with
Julia Floyd about payment for her services.  Floyd reported that Comerica Bank
said Praise Tabernacle could access its trust funds by submitting an invoice
and a check would be issued.  Ward stated that she received a call from Marv
Hoeflinger during the loan closing regarding a referral fee she was to receive
from Mitchell.  She further testified that during this phone call, she spoke
with Carson and Ahe was aware that we had a contract, a signed contract, that
he had agreed to honor.@  She denied agreeing that Hoeflinger or CCS was to pay her
the $80,000 owed under her contract with Praise Tabernacle and ROCK.  She
testified that she was never paid for her services under the contract and
received no response to her payment inquiries.  

Ward
admitted that after getting documents and information from Praise Tabernacle, she
entered into an agreement with Mitchell to assist with preparing the church=s loan application; Mitchell agreed
to pay Ward 0.5 percent of the loan amount as a Areferral fee.@  She indicated she spent four months
assembling a loan package on behalf of Praise Tabernacle without a signed
contract.  She further stated she asked David Lucero, a member of Praise
Tabernacle, to help her in getting the contract signed.[3] 
When asked whether there were any services under her contract with Praise
Tabernacle that she was not already providing as part of her agreement with
CCS, Ward could not identify any specific services.  Finally, Ward acknowledged
that her name was not on any of the loan-closing documents.








2.         David
Mitchell                      

Mitchell
worked with CCS when these events occurred and had worked on several projects
and loans with Ward in the past.  Mitchell stated that Ward was a Amortgage broker@ who brought churches to his
attention that needed money; they worked together to help the churches get
financing.  Mitchell testified that Ward had numerous contacts with churches
and banks.  According to Mitchell, he suggested that CCS could help Praise
Tabernacle obtain a lower rate on a loan.  He agreed with Ward that obtaining
this loan was difficult because of Praise Tabernacle=s foreclosure proceedings.  According
to Mitchell, Ward was able to gather information that explained the foreclosure
situation and why Praise Tabernacle was not current with its mortgage. 
Mitchell testified  that Ward Aproactively@ informed CCS about the foreclosure.

Mitchell
stated he never heard Ward tell Carson about the referral fee she was to
receive from him.  He also admitted he was unaware that Ward had a contract
with Praise Tabernacle and ROCK, but he knew she had worked that way in the
past.  He stated he discovered Ward=s Aside deal@ with the church when Ward asked him
to write a letter detailing what she had done to help close the loan.  He
clarified that Ward helped Adefuse@ the problem with the foreclosure situation, but admitted
that Hoeflinger Agot to the bottom@ of the foreclosure problem and Agot the loan through[.]@  Mitchell further testified that the
loan could not have been made without Ward=s efforts.

3.         Dr. Dana Carson

According
to Carson, he spoke to Ward on average twice weekly throughout the loan
process.  Carson testified he initially thought Ward was part of CCS=s organization.  He stated that he Areluctantly@ signed her contract: 








When I got
that contract from Ms. Ward, that was the first time I was made aware there was
a distinction between [CCS] and the fees associated with the loan and her
fees.  And I B I wasn=t
accustomed to anything like that; and so I felt very hesitant about that.  I
didn=t know she was representing herself and then they were
representing B she was B
you know, themselves.  When she said Awe,@ I thought they were teamed together.

Carson indicated the
church=s legal counsel did not review the
contract before Carson signed it.  He acknowledged that when he signed the
original contract in November, he intended to pay Ward=s fee.  He further stated that he
understood that separate payments were due to Ward and CCS.  He also testified
that Ward told him if he refused to sign the second contract, the loan would
not go through.

Carson
explained that Hoeflinger was paying Ward for the services she provided, but he
acknowledged that nothing in Ward=s contract with Praise Tabernacle and
ROCK required Hoeflinger to pay her.  Carson also stated that he did not inform
Ward she would not be paid, but thought it was implicit that she had gotten Acaught with her hand in the cookie
jar@ and that she would not be paid.  He
testified:

I believed
that she got a B she got B I
entered a contract with her, and I was paying B I got an agreement to pay her for the work that she had already
contracted with [CCS]; she went around and she got us to pay her for the same
things they were paying her for and she kept all of us in the dark from one
another, charging us for the same service.

4.         Marvin Hoeflinger

Hoeflinger
explained that he consults with non-profit organizations to help put together
long-term financing.  He testified that Mitchell was an independent contractor
for CCS.  Hoeflinger stated he never saw Ward=s contract with Praise Tabernacle and
ROCK, and did not know about it until several months after this lawsuit was
filed.  In his opinion, there was no need for such a contract because no
services other than those provided by CCS were necessary.  








According
to Hoeflinger, he and Morgan Keegan identified a lender, and Ward and
Restoration had nothing to do with identifying a lender.  He stated that Ward
did not contact any lenders; CCS was responsible for transmitting the loan
package to the lender, not Ward.  Hoeflinger stated that CCS performed all
negotiations with the lender.  He acknowledged that the loan was difficult to
obtain because of the foreclosure proceedings on Praise Tabernacle=s property, but he stated that he Adid 100% of the work on the
foreclosure problem.@  He also explained that, with Floyd=s assistance, he reviewed all the
church=s payments to the prior lender. 

Hoeflinger
stated that Ward should not be paid two percent of the loan because:

She did not
do anything.  She was paid from Mr. Mitchell 50 basis points for her services,
which is well overcompensated. [CCS] received 75 basis points for all the work
that we did, and we did the majority of the work.  90 percent of the work was
done by our office.  Now, I don=t know why
someone would charge [two] percent on top of what has already been paid, half a
point, for doing what they did.  It is a rip-off, and it=s not right.

Hoeflinger
acknowledged that Ward assisted with the loan, but stated that he believed that
Ward=s payment from Mitchell was
sufficient compensation for her services.  He also acknowledged that CCS=s policy does not bind its clients,
who can enter good or bad contracts with others if they so choose. 

5.         Vincent Aldridge

Attorney
Vincent Aldridge testified that he works in real estate and title transactions
and is familiar with closings and real-estate settlements.  According to
Aldridge, the rights of the parties at closing are generally included in the
closing documents.  In his opinion, Ward=s fee would be Aunbearable@ to Praise Tabernacle and ROCK
because fees come out of the loan proceeds and are paid from church resources. 
He believed her fee would be justified only if all the parties in the process
were aware of it.








Aldridge
acknowledged that Ward could have been paid before providing services to Praise
Tabernacle, which is often the case in such transactions.  He further stated
that he never consulted with the church regarding this loan prior to closing. 
Finally, he stated that the church became aware of all the parties Aat the closing table,@ but had worked, either directly or
indirectly, with all the parties prior to closing.

B.        The Hearing on the Motion
to Disqualify         

As noted
above, Praise Tabernacle and ROCK filed a motion to disqualify Ward and
Restoration=s counsel, Jimmie L. J. Brown, Jr., the week before trial was scheduled
to begin.  At the hearing on the motion, Praise Tabernacle and ROCK called
Vincent Aldridge to testify regarding information he believed Brown possessed
because of Brown=s prior relationship with Carson and the church.  Aldridge
testified that Brown was a former member of the church and had represented
Carson in a family matter in the past.  Aldridge explained that the church=s general counsel, Fred Garrett,
often had engaged Aldridge and Brown in general conversations about legal
matters facing the church.  But when asked whether Aldridge had any
conversations with Brown regarding the facts related to this case, Aldridge
denied relating any specifics to Brown.  Aldridge testified that Brown was
privy to financial information regarding the church and Carson.  Aldridge
expounded on his opinion regarding the impropriety of Brown=s representation of Ward and
Restoration:

My opinion
is that he should be removed and B
based on his closeness to the ministry, his integral workings not only in the
ministry but the pastor in representation.  For the most part, I think that any
B it gives the appearance of B that there could be a reasonable potential conflict
that would come up at any point in time in this case that could really poison
this case from a jury standpoint, and it would lead to a mistrial.  And a lot
of those things may not come into play into the case in chief, depending upon
which route he takes with the case.








The
trial judge repeatedly asked what information might have been divulged to Brown
that was relevant to the facts of this case.  The judge explained, A[F]or me to grant a motion to
disqualify, I got to know, One, that there was an attorney/client relationship;
Two, that there was some specific information relative to this lawsuit divulged
to the other side; Three that that was not going to be readily ascertainable or
discoverable through the ordinary process.@  In response, Aldrigdge stated,

I think the
way this case has been prepared, ultimately it would draw into play that actual
knowledge Mr. Brown has concerning personal matters of the church, personal
matters of the B our pastor, Dr. Dana Carlson.  I think he=s really tried to use that to see if this case would
settle; but when the case didn=t settle, he
found himself in this unfortunate position sitting across the table.  Now I
think he=s going to try to use it to really taint a jury to get
a jury to think that this is just a bad ministry, this is a bad man.  And,
ultimately, this information B ultimately,
there are some things that may come up on the personal level that Mr. Brown was
privy to in his representation that has nothing really B that B 

The trial judge responded
that although Brown may have been privy to some information, he questioned how
any of this information related to this contract case.  He assured the parties
that the court would Atry this lawsuit . . . not . . . the ministry.@  

Brown
responded that the only legal work he did for Carson involved a modification of
child custody.  He also explained that he worked on a mediated hearing
regarding a lease.  Brown admitted that he had been asked a general question
concerning a contract matter by Garrett, but no specific facts were revealed to
him.  Aldridge then stated that he had spoken with Brown regarding this matter
recently, although no names were discussed.  The trial judge stated that, based
on this information, he was Ainclined to grant the motion,@ but that he would give Ward and
Restoration Aample time@ to obtain new representation.  In response, Brown argued, 

Your Honor,
I=ve been in this case since September [2005].  In
September, as I stated in my response to the motion, I indicated to them that
if they are going to file their motion [to disqualify], file the motion and we=ll discuss it at that time.  I can honestly represent
to this Court I didn=t B there is no
way I could have had the conversations because I wasn=t there.  That=s
why I don=t see how this conversation could ever have taken
place.








Brown denied any recent
conversations with Aldridge regarding this case.  He further argued that Praise
Tabernacle and ROCK were precluded from raising this issue because they failed
to file a motion to disqualify in a timely fashion.  The trial judge orally denied
the motion to disqualify without stating his reasons.

II.  Issues Presented

In its
first and second issues, the Church[4] challenges
the legal and factual sufficiency of the evidence to support the jury=s finding that Ward substantially
complied with the terms and conditions of the contract.  In its third issue,
the Church contends the trial court abused its discretion in denying its motion
to disqualify Ward=s trial counsel.

III.  Analysis

A.        Sufficiency of the Evidence

To
determine whether the evidence is legally sufficient to support the judgment,
we review the entire record, crediting favorable evidence if reasonable jurors
could and disregarding contrary evidence unless reasonable jurors could not.  City
of Keller v. Wilson, 168 S.W.3d 802, 827 (Tex. 2005).  We assume that
jurors decided questions of credibility or conflicting evidence in favor of the
verdict if they reasonably could do so.  Id. at 819, 820.  If the
evidence would enable reasonable and fair‑minded people to differ in
their conclusions, then it is legally sufficient to support the verdict. 
Id. at 822.








 When
considering a factual-sufficiency challenge, we review and weigh all the
evidence, not just the evidence that supports the verdict.  See Mar.
Overseas Corp. v. Ellis, 971 S.W.2d 402, 406B07 (Tex. 1998); Nip v. Checkpoint
Sys., Inc., 154 S.W.3d 767, 768B69 (Tex. App.CHouston [14th Dist.] 2004, no pet.). 
We may set aside the verdict only if it is so contrary to the overwhelming
weight of the evidence that the verdict is clearly wrong and unjust.  Dow
Chem. Co. v. Francis, 46 S.W.3d 237, 242 (Tex. 2001) (per curiam) (citing Pool
v. Ford Motor Co, 715 S.W.2d 629, 635 (Tex. 1986)); Mar. Overseas Corp.,
971 S.W.2d at 407; Nip, 154 S.W.3d at 769.  We may not simply substitute
our judgment for that of the jury because the jury is the sole judge of the
credibility of witnesses and the weight to be given their testimony.  Golden
Eagle Archery, Inc. v. Jackson, 116 S.W.3d 757, 761 (Tex. 2003) (citing
Jones v. Tarrant Util. Col., 638 S.W.2d 862, 866 (Tex. 1982)).

As noted
above, the Church challenges the sufficiency of the evidence supporting the
jury=s affirmative finding that Ward and
Restoration Asubstantially complied with the terms and conditions@ of the contract.[5] 
ASubstantial compliance@ was defined in the jury charge as
the performance of all important particulars, with any omissions or deviations
from the contract being made inadvertently and not in bad faith.  According to
the Church, the Aimportant particulars@ of this contract included: (a)
identifying the lender; (b) collecting documents and compiling a loan
application package; (c) transmitting the loan package to the lender; (d)
ensuring that the Church got the best loan rate and terms available; and
(e) working closely with the Church=s team to expedite the loan process. 
The Church asserts that the only Aimportant particular@ of this contract accomplished solely
by Ward and Restoration was the compilation of the loan package.  








Significantly,
however, the terms of Ward=s contract did not prohibit her from using an intermediary
such as CCS to assist her in completing the agreed services.  Moreover, the
jury did not necessarily place the same importance on the contract provisions
emphasized by the Church.  For instance, the jury could have concluded that the
most Aimportant particular@ regarding this contract was the
result, and the testimony is uncontroverted that without Ward and Restoration,
this loan would not have been made. 

Moreover,
even if we consider the rest of the Aimportant particulars@ identified by the Church, Ward
testified that she assisted CCS in identifying the lender, and nothing in the
contract indicates that Ward was required to identify a lender without
assistance.  In addition, Ward testified that she spoke with the lender
numerous times, and the paperwork in her loan file confirmed that she
communicated with the lender.  And, as noted above, the witnesses did not agree
on the particulars of Ward=s role in the loan process.  For example, Ward testified that
she was instrumental in convincing the lender to approve the loan even though
the Church was involved in foreclosure proceedings.  Hoeflinger, on the other
hand, insisted that he was responsible for the loan approval despite the
foreclosure.  But the jury could have determined that Ward was more credible
and placed more weight on her testimony than that of Hoeflinger.[6] 
The jury also could have inferred that Ward obtained the best rates available
by bringing in CCS, which had a unique program to assist churches in obtaining
loans.  Further, it was undisputed that Ward worked closely with the Church=s team in expediting the loan
process.  Although she may not have personally Atransmitted the loan package@ to the lender, the jury could have
placed less importance on this administrative detail than did the Church. 








After
reviewing the entire record, we conclude that reasonable and fair-minded people
could have determined that Ward substantially complied with the terms of the
contract.  We further conclude that the jury=s finding is not contrary to the
overwhelming weight of the evidence.  The fact that the Church also contracted
directly with CCS to provide the same services Ward contracted to provide has
no bearing on whether Ward substantially complied with the terms of her
contract with the Church, nor does the fact that Ward received a referral fee
from Mitchell for providing some of these services.  We therefore overrule the
Church=s first and second issues.

B.        Motion to Disqualify

We
review the trial court=s denial of a motion to disqualify for an abuse of
discretion.  See Metro. Life Ins. Co. v. Syntek Fin. Corp., 881 S.W.2d
319, 321 (Tex. 1994) (per curiam).  It is well-established that
disqualification of a party=s attorney is Aa severe remedy.@ In re Nitla S.A. de C.V., 92
S.W.3d 419, 422 (Tex. 2002) (per curiam) (quoting Spears v. Fourth
Court of Appeals, 797 S.W.2d 654, 656 (Tex. 1990).  Because
disqualification of counsel Acan result in immediate and palpable harm, disrupt trial
court proceedings, and deprive a party of the right to have counsel of choice,@ a trial court considering a motion
to disqualify Amust strictly adhere to an exacting standard to discourage a party from
using the motion as a dilatory trial tactic.@  Id.  Mere allegations of
unethical conduct or evidence showing a remote possibility of a violation of
the disciplinary rules will not satisfy this standard.  In re Sw. Bell
Yellow Pages, Inc., 141 S.W.3d 229, 231 (Tex. App.CSan Antonio 2004, no pet.). Merely
establishing a prior attorney-client relationship is insufficient to establish
cause for disqualification.  In re Chonody, 49 S.W.3d 376, 379 (Tex.
App.CFort Worth 2000, no pet.). And even
if a lawyer violates a disciplinary rule, the party requesting disqualification
must demonstrate that the opposing lawyer=s conduct caused actual prejudice
that requires disqualification.  Nitla, 92 S.W.3d at 422; In re Users
Sys. Servs., Inc., 22 S.W.3d 331, 336B37 (Tex. 1999).

Here,
the Church moved for disqualification based on Rule 109(a)(2) of the Texas
Disciplinary Rules of Professional Conduct (the ARules@), which provides, in pertinent part:

Without
prior consent, a lawyer who personally has formerly represented a client in a
matter shall not thereafter represent another person in a matter adverse to the
former client . . . if the representation in reasonable probability will
involve a violation of Rule 1.05 . . . .








Tex.
Disciplinary R. Prof=l Conduct 1.09(a)(2), reprinted in Tex. Gov=t Code Ann.,
tit. 2, subtit. G app. A (Vernon Supp. 2007) (Tex.
State Bar R. art. X ' 9).  Rule 1.05 addresses the revelation or use of privileged
information or confidential information acquired Aduring the course of or by reason of
the representation of the client.@  Id. 1.05(a) (Vernon 2005).  

The
Church has not established that the trial court abused its discretion in
denying its motion to disqualify Ward=s counsel for several reasons.  At
the hearing on the motion, the Church asserted that it was only when it deposed
a particular witness a month before trial that it learned of Brown=s intent to make some use in the
trial of this case of information about the Church=s accounting practices that he
obtained from his representation of the Church=s pastor in a child custody
proceeding or that he learned from consultations with the Church=s general counsel.  Despite these
assertions, the Church did not request the inclusion of this witness=s deposition in the appellate record,
and as the trial court pointed out, the Church=s accounting practices are irrelevant
to the breach of contract claim before the court.  Moreover, the Church was
aware for nearly a year that Brown was representing Ward, but  did not move for
disqualification until the week before trial.[7] 


In sum,
the Church has identified no confidential information allegedly possessed by
Brown relevant to Ward=s breach of contract case, nor has the Church identified any
authority that would support reversal of the trial court=s judgment on this basis.  We
therefore overrule the Church=s third issue. 








IV.  Conclusion

In sum,
we conclude the evidence is both legally and factually sufficient to support
the jury=s finding that Ward substantially
complied with the terms of her contract.  We further determine that the trial
court did not abuse its discretion in denying the Church=s motion to disqualify Ward=s attorney.  Having overruled all of
the Church=s issues, we affirm the judgment of the trial court.

 

 

/s/        Eva M. Guzman

Justice

 

Judgment rendered and Memorandum
Opinion filed July 29, 2008.

Panel consists of Justices Yates,
Guzman, and Brown.

 

 









[1] 
Although Carson did not execute the contract for
more than a week, the contract was referred to at trial as the AApril 23, 2004 contract.@





[2] 
Our record does not contain a copy of the motion
to disqualify.  But the parties agree that one was filed the week before trial
was set to begin on September 18, 2006, and the reporter=s record from the hearing on the motion is part of our
appellate record.





[3] 
Ward stated that she agreed to pay Lucero
one-half of her fee because he assisted her in getting information together for
the loan application package.  Much of the testimony regarding Lucero, the fee
Ward agreed to pay him, and his relationship with Carson relates to Praise
Tabernacle and ROCK=s claims of fraud, which are not part of this appeal.





[4] 
None of the parties regularly distinguish
between Praise Tabernacle and ROCK.  Instead, they frequently label either one
or both of the entities as Athe church.@  For ease of analysis, we will follow suit, referring
to both entities hereinafter as the AChurch.@  





[5] 
AThe doctrine of substantial compliance excuses
contractual deviations or deficiencies which do not severely impair the purpose
underlying the contractual provision.@  Burtch
v. Burtch, 972 S.W.2d 882, 889 (Tex. App.CAustin 1998, no pet.).  





[6] 
See City of Keller, 168 S.W.3d at 819 (AJurors are the sole judge of the credibility of the witnesses and the
weight to give their testimony.  They may choose to believe one witness and
disbelieve another.@).  





[7] 
AA party who fails to file its motion to disqualify
opposing counsel in a timely manner waives the complaint.@  Vaughan v. Walther, 875 S.W.2d 690, 690 (Tex.
1994) (per curiam) (orig. proceeding).  In Vaughan, the Supreme Court
concluded that because the opposing party was aware of a possible conflict of
interest regarding the relator=s attorney some
six months prior to seeking the attorney=s
disqualification, the trial court abused its discretion by disqualifying the
relator=s attorney.  Id. at 690B91.